BARABY, Admr., et al., Appellants,

v.

SWORDS et al., Appellees.

[Cite as *Baraby v. Swords,* 166 Ohio App.3d 527, 2006-Ohio-1993.]

Court of Appeals of Ohio,
Third District, Allen County.

No. 1–05–76.

Decided April 24, 2006.

528

Margaret M. Murray and Mary S. O'Neill, for appellant.

Victoria U. Maisch, for appellees Lawrence and Carol Swords and Swords Property Management, L.L.C.

Thomas J. Antonini, for appellees Michael C. and Ann B. Murphy.

BRYANT, Presiding Judge.

{¶ 1} Plaintiff-appellant, Natalia Baraby, appeals the judgment of the Allen County Common Pleas Court, denying her motion for partial summary judgment and granting summary judgment to the defendants-appellees, Swords Property Management, Ltd., Lawrence Swords, Carol Swords, Michael Murphy, and Ann Murphy.

## I.  Statement of the Facts

{¶ 2} On January 2, 1986, Michael purchased a property at a sheriff's sale. The property consisted of one structure, containing two apartments, located at 597 and 597½ East Elm Street, Lima, Ohio. Between the date of purchase and sometime in 1988, Michael updated the building, which included removing the old lath and plaster from the walls and installing new drywall and a drop ceiling. Michael also updated the electrical system by removing or disconnecting the old

knob-and-tube wiring, installing modern Romex wiring, removing the old fuse box, and installing a 100–amp breaker box. Some of the new wiring was located in the space between the original ceiling and the drop ceiling, which was accessible by pushing up the panels of the drop ceiling. Michael also owned other properties on which he performed similar work. When renovations were complete, Michael leased the apartments to tenants.

{¶ 3} On September 10, 1988, Michael and Ann executed an antenuptial agreement, which stated that the property located at 597 and 597½ East Elm Street, among others, would remain Michael's separate property. They were married on September 12, 1998. On February 10, 1994, Lawrence and Carol had entered into a land installment contract to buy rental properties, including 597 and 597½ East Elm Street, from Michael and Ann. Lawrence and Carol formed Swords Property Management, Ltd. as an Ohio limited liability company on December 21, 1998, and on April 23, 1999, they assigned the land installment contract to Swords Property. On April 11, 2002, Natalia began leasing the apartment at 597½ East Elm Street, where she lived with her three children, Thomas Terry III, Tre'vyon Terry, and Ny'Kahla Terry. On June 5, 2002, Swords Property paid all amounts due to Michael, who transferred legal title to Swords Property.

{¶ 4} On January 9, 2003, a fire destroyed 597½ East Elm Street. When the fire started, Natalia was sleeping on the couch in the living room. Natalia awoke to find her shirt and the couch on fire and Tre'vyon standing near the burning couch. In the bedroom located directly above the living room were the babysitter, a neighbor's child, Thomas, and Ny'Kahla. The babysitter, Natalia, and Tre'vyon escaped the fire, but Thomas, Ny'Kahla, and the other child became trapped in the bedroom and died when the fire rapidly spread from the living room to the dining room and the upstairs bedroom located directly above the living room. The fire caused heavy damage to 597½ East Elm Street, and although there was minimal damage to 597 East Elm Street, the entire structure was later demolished.

## II. Statement of the Case

{¶ 5} The trial court's docketing statement shows an extensive procedural history in this case; however, the following timeline is helpful in understanding the key events of this case. On March 10, 2004, Natalia filed a complaint against Lawrence and Swords Property. Natalia filed the complaint in her individual capacity, as the administratrix for the estates of Thomas and Ny'Kahla, and as the parent, guardian, and next friend of Tre'vyon. Lawrence and Swords Property filed their answer and a third-party complaint against Michael and Ann on May 20, 2004. On June 22, 2004, Natalia filed a "counter-claim" against the

third-party defendants, Michael and Ann. In October 2004, Michael and Ann filed answers to the third-party complaint and Natalia's "counter-claim." They also filed a counterclaim against the third-party plaintiffs, Lawrence and Swords Property. On November 1, 2004, Natalia filed an amended complaint, naming Michael, Ann, and Carol as direct defendants. Lawrence and Swords Property filed their answer to the third-party counterclaim on November 8, 2004. All defendants timely filed answers to the amended complaint.

{¶ 6} The parties filed their motions for summary judgment on July 15, 2005. Michael and Ann filed a joint motion, Ann filed a motion individually, Lawrence, Carol, and Swords Property filed a joint motion, and Natalia filed a motion requesting partial summary judgment. Between July 15, 2005, and August 29, 2005, the parties filed their responses, replies, various exhibits, depositions, and answers to interrogatories, requests for the production of documents, and requests for admissions. On August 29, 2005, Lawrence, Carol, and Swords Property dismissed their third-party complaint against Michael and Ann. The trial court filed a judgment entry on September 21, 2005, granting summary judgment in favor of each defendant and denying partial summary judgment to the plaintiff. Natalia appeals the trial court's judgment and asserts the following assignments of error:

> The trial court erred in ruling that Appellees Lawrence Swords and Carol Swords had complied with the Lima Code requiring a landlord to provide an operable smoke alarm on each floor of the dwelling.

> The trial court committed an error of law in ruling that the Swords Appellees were shielded from individual liability by virtue of the fact they had formed a limited liability company.

> The trial court erred in ruling that Appellees Michael C. Murphy and Ann B. Murphy owed no duty to Appellants.

> The trial court erred in ruling that Appellants' motion for partial summary judgment on the issue of comparative negligence was moot in light of assignments of error nos. I–III.

### III. Standard of Review

{¶ 7} A trial court's grant of summary judgment is reviewed de novo on appeal. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198. Thus, such a grant will be affirmed only when there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law, and "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." Civ.R. 56(C).

{¶ 8} The moving party may file its motion for summary judgment "with or without supporting affidavits[.]" Civ.R. 56(A). However, "[a] party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond." *Mitseff v. Wheeler* (1988), 38 Ohio St.3d 112, 526 N.E.2d 798, syllabus. Once the moving party demonstrates that it is entitled to summary judgment, the burden shifts to the nonmoving party to show why summary judgment is inappropriate. See Civ.R. 56(E). If the nonmovant fails to respond, or fails to support its response with evidence of the kind required by Civ.R. 56(C), the court may enter summary judgment in favor of the moving party. Id. Otherwise, summary judgment should be granted with caution, with a court construing all evidence and deciding any doubt in favor of the nonmovant. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 360, 604 N.E.2d 138.

### IV. Summary Judgment as to Michael and Ann Murphy

{¶ 9} As to Michael and Ann, the trial court granted summary judgment, holding that there was no privity between them and Natalia. The court also held that because Michael and Ann owed no duty to Natalia, they were not required to comply with the Lima City Building Code. Natalia argues that the trial court erred for the following reasons. First, Natalia contends that Michael and Ann were her landlords and in privity with her so as to owe a duty of care. Second, Natalia contends that Michael and Ann, as owners of the property, owed a duty to warn of latent or concealed dangerous conditions. Finally, Natalia contends that Michael and Ann owed a duty regardless of privity because Michael was a builder/vendor who knew about a dangerous condition on the property. In response, Michael and Ann argue there was no privity of contract between them and Natalia, they were never Natalia's landlords, they did not owe her a duty to warn of dangerous conditions, and Ohio law should not be expanded to allow a vendee's tenant to assert a cause of action against a builder/vendor. Michael and Ann argue that Michael is not a builder/vendor. Additionally, in her motion for summary judgment, Ann argued she had no ownership interest in the property because Michael acquired it prior to their marriage, and they executed an antenuptial agreement designating 597 and 597½ East Elm Street as Michael's separate property.

{¶ 10} In order to survive a properly supported motion for summary judgment in a negligence action, the nonmovant must establish genuine issues of material fact as to whether (1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the duty of care; and (3) as a direct and proximate result of the defendant's breach, the plaintiff suffered injury. See *Texler v. D.O. Summers Cleaners* (1998), 81 Ohio St.3d 677, 680, 693 N.E.2d 271. If a

defendant points to evidence illustrating that the plaintiff will be unable to prove any one of the foregoing elements, the defendant is entitled to judgment as a matter of law. See *Feichtner v. Cleveland* (1994), 95 Ohio App.3d 388, 394, 642 N.E.2d 657.

### *IV(a).    Owner/Landlord Liability*

{¶ 11} We will consider Natalia's first two arguments together. The Landlord and Tenant Act requires landlords to "[c]omply with the requirements of all applicable building, housing, health, and safety codes that materially affect health and safety" and to "[m]ake all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition[.]" R.C. 5321.04(A)(1) and (2). A violation of R.C. 5321.04 is negligence per se, which establishes only duty and breach, and requires the plaintiff to prove causation and damages. *Shroades v. Rental Homes, Inc.* (1981), 68 Ohio St.2d 20, 26, 22 O.O.3d 152, 427 N.E.2d 774; *Williams v. 312 Walnut Ltd. Partnership,* 1st Dist. No. C–960368, 1996 WL 741982, at *4, citing *Gressman v. McClain* (1988), 40 Ohio St.3d 359, 362, 533 N.E.2d 732; *Taylor v. Webster* (1967), 12 Ohio St.2d 53, 56, 41 O.O.2d 274, 231 N.E.2d 870.

{¶ 12} The city of Lima has enacted a building code, which governs the installation and maintenance of smoke detectors in residential buildings. Specifically, the code places certain affirmative duties on property owners. The sections applicable to this matter state:

MAINTENANCE OF FIRE PROTECTION SYSTEMS

All systems, devices and equipment to detect a fire, actuate an alarm, or suppress or control a fire, or any combination thereof, *shall be properly maintained.* * * *

SMOKE DETECTORS; INSTALLATION; POWER SOURCE; TAMPERING.

A minimum of one approved single-station or multiple-station smoke detector shall be installed * * * in the immediate vicinity of the bedrooms in occupancies in Use Groups R–2 and R–3. In all residential occupancies, *smoke detectors shall be required on every story of the dwelling unit, including basements.* * * * *When actuated, the smoke detectors shall provide an alarm suitable to warn the occupants within the individual room or dwelling unit.*

(Emphasis added). Lima Building Code, Apr. 11, 1994, 1824.20, 18.24.30.

{¶ 13} Clearly, the building code was enacted to materially affect the health and safety of building occupants. However, to establish a duty to comply with either R.C. 5321.04 or the building code, a plaintiff must prove that a defendant was a landlord or owner.

{¶ 14} The parties do not dispute that Michael, Ann, Lawrence, and Carol executed a land installment contract on February 10, 1994, which was filed in the Allen County Recorder's office. "[W]here land is contracted to be sold, even under an executory contract, equity treats the exchange as actually taking place when the contract becomes effective." *Wood v. Donohue* (1999), 136 Ohio App.3d 336, 339, 736 N.E.2d 556, citing *Berndt v. Lusher* (1931), 40 Ohio App. 172, 176, 178 N.E. 14. A land installment contract is an executory agreement whereby the purchaser (vendee) agrees to pay the purchase price and is vested with equitable ownership, while the seller (vendor) retains bare legal title in the property to secure payment of the purchase price. See *Wood,* supra; *Flint v. Holbrook* (1992), 80 Ohio App.3d 21, 608 N.E.2d 809; *Gottfried v. Bacon* (Oct. 10, 1989), 3d Dist. No. 16–87–32, 1989 WL 122533.

{¶ 15} In *Gottfried,* the vendor owned a building on which he had changed an entryway. Several years later, he sold the property to the vendee through a land installment contract. The vendee leased the premises to a third party, and an invitee of the third party was injured when she tripped and fell over an elevated portion of the entryway. Legal title had not passed to the vendee at the time of the invitee's injury. In finding that the vendor was not liable to the invitee, we stated that the vendor entered into the land installment agreement, thereby "divesting himself of equitable title to the premises[,] retaining only the bare legal title[,] and reserving only such rights of entry and control as necessary to preserve the integrity of the building." *Gottfried,* 3d Dist. No. 16–87–32, 1989 WL 122533, *4. Although the injured party in *Gottfried* was an invitee of the tenant, we held that the vendor was not liable because he "was not the landlord * * * [and] had no contractual agreement with the tenants in possession[.] * * * [The vendor] not only had divested himself of equitable title to the premises prior to the mishap but had retained no right whatever to admit people to the premises and to exclude people from it." Id. at *4, 5.

{¶ 16} In *Flint,* 80 Ohio App.3d 21, 608 N.E.2d 809, the vendor entered into a lease agreement with the vendee, who kept a pitbull dog on the property. The vendor later sold the property to the vendee through a land installment contract. After signing the contract, but before legal title passed, the dog bit Flint. Flint sued both the vendor and the vendee. The court stated that the land installment contract transferred ownership and equitable title to the vendee, who "had exclusive possession and control of the premises[.]" Id. at 28, 608 N.E.2d 809. The court noted that the vendor had "simply financed the property for" the vendee and granted judgment in favor of the vendor. Id.

{¶ 17} This case is similar to *Gottfried* and *Flint.* Michael, Ann, Lawrence, and Carol entered into the land installment agreement on February 10, 1994. On that date, Michael essentially financed the property for Lawrence and

Carol, and equitable title passed from Michael to Lawrence and Carol. Michael retained bare legal title and reserved only those "rights of entry and control as necessary to preserve the integrity of the building." See *Gottfried*, 3d Dist. No. 16–87–32, 1989 WL 122533, at *4. Michael testified that he did not retain keys for the structure, and he had not been on the property since execution of the contract in 1994. The record contains no evidence to the contrary.

{¶ 18} Natalia entered into a lease agreement on April 11, 2004, prior to transfer of legal title. As discussed herein, Natalia's lease agreement was between her and either Lawrence or Swords Property. Michael and Ann were not parties to the lease agreement. Bare legal title passed from Michael to Swords Property on June 5, 2002. Clearly, there is no privity of contract between the tenant and the vendor. Therefore, Michael and Ann were neither landlords nor owners of the property at the time Natalia leased 597½ East Elm Street.

■ {¶ 19} Furthermore, we note that Ann never had an ownership interest in the property. Attached to Ann's original motion for summary judgment were an affidavit and a copy of an antenuptial agreement, dated September 10, 1988. The agreement clearly states that 597 and 597½ East Elm Street were Michael's separate property. Ann stated that she signed the land installment contract and the deed in order to release her dower rights. A spouse does not have ownership rights in the other spouse's separate property, which includes "property acquired before the marriage" and "property excluded by a valid antenuptual [sic] agreement". *Kerchenfaut v. Kerchenfaut*, 3d Dist. No. 1–01–14, 2001 WL 1023105, at *2, citing R.C. 3105.171(A)(6). Nothing in the record challenges that Michael bought the property prior to the marriage or the validity of the antenuptial agreement. Although several witnesses testified that Ann owned the property because she signed the land installment agreement and the deed, Ann's proper status in relation to the property is a legal conclusion, and none of the witnesses in this case have been qualified as legal experts. See generally *Niermeyer v. Cook's Termite & Pest Control, Inc.*, 10th Dist. No. 05AP–21, 2006-Ohio-640, 2006 WL 330099. Because Michael and Ann did not own the property on April 22, 2002, and because there was no privity of contract, they owed no duty to Natalia to either comply with R.C. 5321.04 or the building code or to disclose latent defects in the property. Natalia's first two arguments are not well taken.

### IV(b). Builder/Vendor Liability

■ {¶ 20} As to Natalia's final argument—that Michael is liable as a builder/vendor, we find that summary judgment in Michael's favor is appropriate. As to builder/vendor liability, the Ohio Supreme Court has held:

A duty is imposed by law upon a builder-vendor of a real-property structure to construct the same in a workmanlike manner and to employ such care and skill in the choice of materials and work as will be commensurate with the gravity of the risk involved in protecting the structure against faults and hazards, including those inherent in its site. If the violation of that duty proximately causes a defect hidden from revelation by an inspection reasonably available to the vendee, the vendor is *answerable to the vendee* for the resulting damages.

(Emphasis added.) *Mitchem v. Johnson* (1966), 7 Ohio St.2d 66, 36 O.O.2d 52, 218 N.E.2d 594, at paragraph three of the syllabus. *Mitchem* clearly allows a vendee to bring a cause of action against a builder/vendor. No court in Ohio has allowed a tenant to assert a cause of action against a builder/vendor unless the builder/vendor has built a structure based on a commercial tenant's specific needs. See *United States Fid. & Guar. Co. v. Schneider, Inc.*, 6th Dist. No. H–94–008, 1995 WL 433954, at *4 ("where a building is constructed for the specific purpose of serving a tenant's understood needs, the contractor owes a duty of due care in the design and construction of the building to such tenant, even though there is no privity of contract between them"). We find no reason to expand Ohio law to create a new class of plaintiffs. Because Natalia may not assert a cause of action against Michael based on builder/vendor liability, we need not address whether he was a builder/vendor or whether he remodeled the apartment in a workmanlike manner. Natalia's final argument as to Michael's and Ann's liability is not well taken. Summary judgment in favor of Michael and Ann is appropriate because, as a matter of law, they owed no duty to Natalia. The third assignment of error is overruled.

### V. Summary Judgment Issues as to Whether Lawrence Swords, Carol Swords, and/or Swords Property Management, Ltd. Complied with R.C. 5321.04 and the Building Code.

{¶ 21} As to Lawrence and Carol Swords, the trial court granted summary judgment, finding they did not breach the building code requiring the installation and maintenance of smoke detectors on each level of a residential structure. Natalia contends there are genuine issues of material fact as to whether Lawrence and Carol installed the required number of smoke detectors and whether they maintained the installed smoke detector. Natalia contends that a landlord has an affirmative duty to maintain smoke detectors and is not excused from compliance merely because a tenant fails to notify him about a problem, and she is not required to prove the cause of the fire in order to prove negligence for failure to install and maintain the required number of smoke detectors. In response, Lawrence and Carol essentially contend that the fact-finder, by making reasonable inferences from the evidence, could find they complied with the building code. Lawrence and Carol also contend they properly maintained the

smoke detector by changing the battery each year, and a tenant has the duty to test smoke detectors as necessary. Finally, Lawrence and Carol contend, "It is essential for Appellant to prove what the cause and origin of the fire was in order to prove a breach of any duty by the landlord to maintain the premises in a reasonably safe and habitable manner."

### V(a). Duty

{¶ 22} As mentioned above, Lawrence and Carol owned the property upon executing the land installment contract on February 10, 1994. When the land installment contract was assigned to Swords Property, the company became the owner of the property and was liable for any obligation. "Assignee agrees to assume * * * the performance of all other obligations required by the land installment contract." See *Fellabaum v. Mulbarger Bros. Partnership*, 10th Dist. No. 80AP–352, 1980 WL 353641 (implies that an assignee is liable for all obligations under a land installment contract if those obligations are specifically assigned). While reserving the issue of individual liability as to Lawrence and Carol, it is clear that Swords Property, as owner of the property at the time Natalia leased the apartment and at the time of the fire, had a duty to comply with the building code and the Landlord and Tenant Act.

### V(b). Breach

{¶ 23} Our review of the record indicates genuine issues of material fact as to how many smoke detectors were installed in 597½ East Elm Street and where they were located. The facts are undisputed that there was no smoke detector in the basement. Natalia testified that there was only one smoke detector in the apartment, which was located on the first floor in the stairway leading to the second floor. Natalia testified that the smoke detector was in close proximity to the kitchen because she would occasionally activate it when cooking. Natalia also stated she was unaware of any other smoke detector in the apartment. Likewise, Lawrence testified there was only one smoke detector; however, he testified that the smoke detector was on the second floor near the bedrooms. Lawrence also admitted the following:

Admit that on January 9, 2003, there was only one smoke and/or fire detector in the residence at 597½ E. Elm Street, Lima, Ohio.

**Admit or Deny:** Admitted as to mechanical devices.

{¶ 24} Michael testified that he installed one smoke detector, which was located on the second story near the bedrooms. Swords Property filed Dr. Maria Ignatieva's affidavit, in which she stated that she had rented 597½ East Elm Street from Swords Property between August 1993 and June 2000. She also stated: "I recall that there were two smoke detectors within 597½ East Elm

Street, Lima, Ohio. One smoke detector was located at the top of the stairs on the landing near the two bedroom doors. The other smoke detector was located *near the kitchen* on the first floor." (Emphasis added.) Although Ignatieva did not know the condition of the apartment as of January 2003, her affidavit was based on her own personal experience. There is no evidence in the record indicating that a smoke detector had been removed from the apartment. Likewise, the evidence indicates that a smoke detector was found on the second floor near the location identified by Ignatieva and Lawrence. Additionally, Natalia testified that the smoke detector on the first floor was in close proximity to the kitchen. Although only one smoke detector was retrieved from the apartment after the fire, several experts testified that a smoke detector on the first floor could have been thrown in the outdoor trash pile during the suppression of the fire, or the smoke detector could have been destroyed during the fire so as to be undetectable in the ruins. This evidence creates a genuine issue of material fact as to how many smoke detectors were located in the apartment, which creates a genuine issue of material fact as to whether Swords Property complied with section 1824.30 of the building code and R.C. 5321.04(A)(1).

{¶ 25} There is also a genuine issue of material fact as to whether any smoke detector was properly maintained. Ignatieva stated: "I recall that both smoke detectors worked because I clearly remember that they would occasionally sound when I was cooking." Natalia recalled the location of the smoke detector on the first floor because she would sometimes activate it while cooking. However, she stated that nobody had changed the battery in the smoke detector to her knowledge, and she did not remove the battery from the smoke detector. Lawrence testified that he replaced the battery in the smoke detector on the second floor of the apartment when he repaired a broken thermostat for Natalia. In his answers to interrogatories, Lawrence stated that he changes smoke detector batteries for each new tenant or when he is at a property and hears a smoke detector chirping. Although Lawrence's answer to an interrogatory does not reflect what he did at 597½ East Elm Street, it may reflect his habits as a landlord.

{¶ 26} The evidence is undisputed that a battery was found next to the smoke detector on the second floor. The evidence is also undisputed that no expert can ascertain whether the battery had been connected to the smoke detector at the time of the fire. However, Natalia's expert testified that the battery found near the smoke detector had a replacement date of 2006. Based on this record, we find genuine issues of material fact as to whether Swords Property breached its duty under R.C. 5321.04(A)(1) and section 1824.20 of the building code.

{¶ 27} The parties also dispute who is responsible for testing smoke detectors. Natalia urges us to hold that a landlord is responsible to test a smoke detector

each week, while Lawrence contends that the tenant bears the responsibility of testing smoke detectors. Since the building code does not define "properly maintained," the issue is best left to the jury for determination. In conjunction with this issue, the jury may need to determine whether Swords Property knew or should have known about a defect with any installed smoke detector. As we have previously stated, "lack of notice is a legal excuse that applies where 'the actor neither knows nor should know of any occasion or necessity for action in compliance with the legislation or regulation.'" *Saum v. Kelly,* 3d Dist. No. 5–04–53, 2005-Ohio-2895, 2005 WL 1384102, at ¶ 15 (quoting *Sikora v. Wenzel* (2000), 88 Ohio St.3d 493, 498, 727 N.E.2d 1277). There has been no evidence in this case to suggest that Natalia notified Swords Property concerning a defect with a smoke detector. Therefore, the jury must determine the extent of the landlord's duty to test smoke detectors in properly maintaining them, and depending on that determination, whether Swords Property should have known of a defect.

### V(c). Causation

{¶ 28} As to causation, the parties have disputed the cause of the fire to justify their respective positions on whether summary judgment was appropriate. However, the cause of the fire is not at issue when we review whether the landlord was negligent for failing to install and maintain smoke detectors in violation of the building code and R.C. 5321.04. See *Starost v. Bradley* (Jan. 29, 1999), 2d Dist. No. 17319, 1999 WL 41897, at *5.

{¶ 29} The parties do not dispute that the Baraby family has suffered some injury. Swords Property clearly had a duty to install and maintain the required number of smoke detectors. For ease of analysis, if we assume a breach of duty, the questions concerning causation are whether the lack of required smoke detectors caused the injury and whether improperly maintained smoke detectors caused the injury. "Proximate cause" is "'a happening or event which as a natural and continuous sequence produces an injury without which the result would not have occurred.'" (Internal citation omitted.) *Snyder v. Ford Motor Co.,* 3d Dist. No. 1–05–41, 2005-Ohio-6415, 2005 WL 3274868, at ¶ 31, quoting *Zavasnik v. Lyons Transp. Lines, Inc.* (1996), 115 Ohio App.3d 374, 377, 685 N.E.2d 567. Therefore, proximate cause is a "but-for" test, as in, but for the failure to install the required number of smoke detectors, the children's deaths would not have resulted, or but for the failure to properly maintain the smoke detectors, the children's deaths would not have resulted.

{¶ 30} Although a landlord may not be liable for a fire, nonetheless, he or she may be liable for injuries suffered as a result of violating a building code, which

requires the proper installation and maintenance of smoke detectors. As the Second District Court of Appeals has noted:

> An ordinance or other regulation that requires installation of smoke detector alarms in buildings creates an inference that the alarms will diminish the risk of harm to persons who are inside when a fire occurs *because the alarm is designed and intended to warn them of the fire in its early stages, before they may otherwise be aware of it, improving their opportunity to escape the fire and avoid the harm that may result from it.* Therefore, depending on the particular facts and circumstances involved, including the location and progress of the fire and smoke, the location of the alarms, and the available avenues of escape, a trier of fact may find that failure to install required smoke detector alarms subjected persons in the building to a greater risk of harm from the fire, creating some measure of liability in them for any injuries arising from a fire that occurred. Whether that increased risk of harm occurred is not a matter for speculation, but one that jurors may reasonably decide on the basis of their common knowledge and understanding. *The jury may find that the fire was not the result of the breach by these Defendants of a duty of ordinary care that they owed the Plaintiff. Even so, Defendants may yet be found liable for some or all of the Plaintiff's injuries and losses if the jury finds that they directly and proximately resulted from the Defendants' failure to comply with the requirements of the ordinance.*

(Emphasis added.) *Starost,* 2d Dist. No. 17319, 1999 WL 41897, at *5.

{¶ 31} In this case, Dennis Smith testified as an expert witness on Natalia's behalf. He deferred any opinions on smoke detectors to Natalia's expert, Daniel Gottuk. Gottuk testified that he examined the remains of the smoke detector located on the second floor of the apartment. From his examination, he was unable to determine whether the alarm functioned at the time of the fire. His review of the evidence indicated that nobody reported hearing the smoke detector. As noted above, none of the experts could determine whether the battery was connected at the time of the fire, and Gottuk had no evidence to determine whether the alarm itself was defective. Mark Heffner, assistant chief of the Lima Fire Department, also testified. He concluded that any smoke detectors in the building were not operational based on his conversations with bystanders and the victims at the time of the fire. He also testified that a smoke detector should have sounded long before the fire reached the point of flashover, which had occurred before the fire department arrived. There is no evidence that the smoke detector did activate during the fire. Construing the evidence in favor of the nonmovant, Natalia, there are no genuine issues of material fact as to causation; however, Natalia has not moved for summary judgment.

{¶ 32} Due to genuine issues of material fact as to whether Swords Property installed and maintained the required number of smoke detectors, summary judgment in favor of Swords Property, Lawrence, and/or Carol is inappropriate. Therefore, the trial court erred by granting summary judgment in favor of Lawrence and Carol on this issue, and the first assignment of error is sustained.

## VI. Summary Judgment Issues as to Lawrence Swords's and Carol Swords's Individual Liability

{¶ 33} As to whether Lawrence and Carol are individually liable, the trial court found they had acted within the capacity of their membership in Swords Property and dismissed them as defendants. Natalia contends that limiting personal liability through a limited liability company is an affirmative defense, which Lawrence and Carol waived by failing to properly raise it. Natalia also argues that Lawrence and Carol failed to disclose the existence of Swords Property and acted in their personal capacities when she entered into her lease agreement. Finally, Natalia argues that even if Lawrence and Carol acted as members of Swords Property, the corporate form should be disregarded under the test set forth in *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075. In response, Lawrence and Carol contend that they denied any allegation of personal responsibility in their answer and therefore, they are not required to raise their denial as an affirmative defense. Carol contends she has performed no act outside her capacity as a member of Swords Property, so she should be dismissed. Likewise, Lawrence contends that he has not performed any act outside his capacity as the manager of Swords Property, and he should be dismissed. Finally, Lawrence, Carol, and Swords Property contend that Lawrence did not act fraudulently or illegally so as to allow Natalia to "pierce the corporate veil" of Swords Property and impose individual liability.

{¶ 34} Section 1705.48 of the Revised Code states:

The debts, obligations, and liabilities of a limited liability company, whether arising in contract, tort, or otherwise, are solely the debts, obligations, and liabilities of the limited liability company.

Neither the members of the limited liability company nor any managers of the limited liability company are personally liable to satisfy any judgment, decree, or order of a court for, or are personally liable to satisfy in any other manner, a debt, obligation, or liability of the company solely by reason of being a member or manager of the limited liability company.

Nothing in this chapter affects any personal liability of a member of a limited liability company or any manager of a limited liability company for the member's or manager's own actions or omissions.

R.C. 1705.48(A)-(C). We hold that the protection against individual liability afforded to members and managers of a limited liability company is an affirmative defense. Affirmative defenses must be set forth in a responsive pleading, through a Civ.R. 12(b) motion, or by an amendment under Civ.R. 15. See *Eulrich v. Weaver Bros., Inc.,* 165 Ohio App.3d 313, 2005-Ohio-5891, 846 N.E.2d 542, at ¶ 13. In this case, Lawrence and Carol failed to raise the defense provided by R.C. 1705.48 until they filed their motion for summary judgment. An affirmative defense is defined as "a new matter which, assuming the complaint to be true, constitutes a defense to it * * * [and] 'any defensive matter in the nature of a confession and avoidance. It admits that the plaintiff has a claim (the "confession") but asserts some legal reason why the plaintiff cannot have any recovery on that claim (the "avoidance").' " *Eulrich,* 165 Ohio App.3d 313, 2005-Ohio-5891, 846 N.E.2d 542, at ¶ 15, quoting *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 33, 661 N.E.2d 187. R.C. 1705.48 constitutes a defense for Lawrence and Carol, assuming the allegations in Natalia's complaint to be true. By arguing that R.C. 1705.48 protects them from individual liability, Lawrence and Carol essentially admit that Natalia has a claim (the confession), but assert statutory protection as to why she cannot recover from them individually (the avoidance). Because Lawrence and Carol failed to properly raise the affirmative defense, they have waived it.

{¶ 35} Therefore, we must consider whether Lawrence and/or Carol are entitled to summary judgment as individuals on Natalia's negligence claim. The facts are not disputed that when Natalia leased the property, Swords Property owned the apartment pursuant to the assignment of the land installment contract, effective April 23, 1999. As discussed above, Lawrence and Carol assigned all rights and obligations under the land installment contract to Swords Property. Therefore, Swords Property owned 597½ East Elm Street as on April 23, 1999, and Lawrence and Carol owed no duty under R.C. 5321.04(A)(1) or the building code.

{¶ 36} However, Lawrence may have incurred individual liability by holding himself out as the landlord of the property. The rental application contained the business name "Marcar Enterprises," but listed Lawrence's and Carol's names in the address section. Likewise, the lease contained the following names:

CUSTOM PROPERTY MANAGEMENT

Lawrence and Carol Swords

Apparently, Lawrence executed the lease in his personal capacity, as there was no notation as to his capacity to act on behalf of a business. On the lead-based paint disclosure, Lawrence signed his name next to the phrase "Owner or agent". However, Lawrence testified that he intended to bind Swords Property. On

these facts, there is a genuine issue of material fact as to whether Lawrence incurred individual liability as a landlord.

{¶ 37} There has been no evidence to indicate that Carol acted in an individual capacity in this matter. Carol testified that she had no involvement with the property. There is no evidence that Carol signed any of the paperwork in leasing the apartment to Natalia. Likewise, Natalia testified that she had no contact with Carol. As to Carol, there are no genuine issues of material fact, and she is entitled to summary judgment as a matter of law. Carol did not own the property at the time of the lease, and she took no action through which she could incur individual liability. The third assignment of error is sustained in part and overruled in part.

## VII.  Partial Summary Judgment as to Comparative Negligence

{¶ 38} In the fourth assignment of error, Natalia contends the trial court erred by overruling her motion for partial summary judgment. Because the trial court granted summary judgment to all of the defendants, it overruled Natalia's motion for partial summary judgment because the issue was moot. We find a genuine issue of material fact as to comparative negligence.

{¶ 39} Natalia's lease provided she would "keep [the] premises in a clean and sanitary condition" and pay for damages caused by her or her guests. There is clearly no genuine issue of material fact that Natalia had a duty to not burn the apartment, intentionally or otherwise. As to causation, all of the experts agreed that the fire started in the living room. Most of the expert witnesses were unable to identify a more specific origin or source of the fire. However, the fire report cited the cause of fire to be faulty electrical wiring, and Jon Jenkins, the fire inspector, testified that the fire started between the original ceiling and the drop ceiling and that the electrical wiring was the only physical evidence of ignition. In contrast, Swords Property's experts believe the fire started either behind or under the couch, possibly the result of a faulty power cord. More specifically, Churchwell, an electrical engineer, stated that the fire did not start in the ceiling or wall area, disagreed that fixed wiring caused the fire, and stated that the fire was probably caused by a short circuit in a power cord. Therefore, there is a genuine issue of material fact as to causation. The trial court's conclusion in denying partial summary judgment was correct, but it erred in its reasoning. The fourth assignment of error is overruled.

## VIII.  Conclusion

{¶ 40} Summary judgment is appropriate as to the defendants-appellees, Michael Murphy, Ann Murphy, and Carol Swords, and the trial court's judgment is affirmed as to those parties. Summary judgment is inappropriate as to the issue of comparative negligence, and the trial court's judgment as to that issue is

affirmed. Summary judgment is inappropriate as to defendants-appellees, Lawrence Swords and Swords Property Management, Ltd., and the trial court's judgment is reversed as to those parties. Therefore, the judgment of the Allen County Common Pleas Court is affirmed in part and reversed in part, and this cause is remanded for further proceedings.

Judgment affirmed in part
and reversed in part,
and cause remanded.

ROGERS and CUPP, JJ., concur.