[Cite as *Stamper v. Polley*, 2020-Ohio-3709.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY


ANGUS STAMPER, ET AL.,                              :

    Plaintiffs-Appellees/                          :      Case No.   19CA1088
    Cross-Appellants,
                                                   :

    vs.
                                                   :

WILLIAM POLLEY, ET AL.,                            DECISION AND JUDGMENT ENTRY
                                                   :
    Defendants-Appellants/
    Cross-Appellees.                               :

---

APPEARANCES:

Tyler E. Cantrell, West Union, Ohio for appellants.

David E. Grimes, West Union, Ohio, for appellee.

---

CIVIL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED:  7-2-20
ABELE, J.

{¶ 1} This is an appeal from an Adams County Common Pleas Court judgment in favor of

Angus J. Stamper and Rosemary Miller, plaintiffs below and appellees herein.   William Polley

and Joyce Polley, defendants below and appellants herein, assign the following errors for review:

> FIRST ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED IN GRANTING JUDGMENT IN
> FAVOR OF THE PLAINTIFFS AS IT IS AGAINST THE
> MANIFEST WEIGHT OF THE EVIDENCE."
>
> SECOND ASSIGNMENT OF ERROR:
>
> "THE TRIAL COURT ERRED IN AWARDING INTEREST ON
> THE JUDGEMENT [SIC] AWARD."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED IN GRANTING JUDGMENT
FOR THE PLAINTIFFS IN THE AMOUNT OF NINETEEN
THOUSAND SEVEN HUNDRED SIXTY-SIX DOLLARS AND
41/100 ($19,766.41)."

{¶ 2} Appellees raise the following cross-assignment of error:

"THE TRIAL COURT ERRED IN REDUCING THE
JUDGMENT IN FAVOR OF THE APPELLEES BASED ON
APPELLANTS' HOME EQUITY LOAN."

{¶ 3} In 2002, appellants purchased real estate located in the Village of Seaman. At the time, appellants also owned property located in Winchester. Appellants obtained a $45,000 home equity loan on their Winchester residence to purchase the Seaman property. Appellants also procured a $45,000 insurance policy on the Seaman property. Appellants' son lived on the property until early 2016.

{¶ 4} On May 28, 2016, appellants and appellees entered into a land contract for the purchase of the Seaman residence. Under the contract, appellees agreed to purchase the property for $25,000, with 5 percent interest per year, and make $400 monthly payments. The contract also required appellees to "provide and maintain fire and extended insurance coverage for the improvements on the property, in an amount not less than the purchase price balance * * * with loss payable to the Vendor and Vendees, as their interests appear." The contract stated that once appellees fulfilled their contractual obligations, appellants would convey the property to appellees by general warranty deed.

{¶ 5} On August 25, 2017, a fire completely destroyed the Seaman residence. Appellants received $44,626.36 from their insurance company to cover the loss and used $31,563.93 to pay

off the home equity loan on their Winchester residence. Appellants also gave appellees $3,000 and offered to give appellees the deed to the property if appellees cleaned up the destroyed structure. Appellants accepted the $3,000, but viewed it as a down payment until the parties later agreed to a division of the insurance proceeds. Appellee Stamper explained that his acceptance of the $3,000 did not mean that he accepted appellants' offer to pay appellees $3,000 and give them a deed to the property, but instead he viewed the $3,000 as partial payment on the insurance proceeds that he believed appellees should receive.

{¶ 6} Because the parties could not agree regarding the division of the insurance proceeds, appellees filed a complaint and asked the trial court to order appellants to specifically perform the contract and to pay appellees their portion of the insurance proceeds.

{¶ 7} On January 3, 2019, the court held a trial. The parties stipulated that the principal balance remaining due under the contract is $19,400 and the interest balance is $745.09. The parties disputed, however, whether appellees should be entitled to more than $3,000 from the insurance proceeds. Appellants maintained that the policy was issued in their names, solely for their benefit. Thus, appellants reasoned, the fire insurance proceeds they received for the Seaman property should be for their benefit and allow them to pay off the home equity loan on their Winchester residence. Appellees asserted that they are entitled to $21,189.27, plus the deed to the property. Appellees arrived at that figure by subtracting from the insurance proceeds ($44,626.36): (1) the remaining balance due ($19,400); (2) the interest ($745.09); (3) tax ($292); and (4) the $3,000 appellants gave appellees. Appellees additionally claimed that they are entitled to interest on the insurance proceeds from the date appellants received the insurance check.

{¶ 8} After the parties' closing arguments, the trial court ruled from the bench. The court

took note of appellees' request for $21,189.27, but reduced the amount. The court pointed out that the land contract specified that appellees would make 31 payments through January 1, 2019, but before the fire appellees had made 14 payments. The court thus concluded that 17 payments remained for a total of $6,800. The court decided to offset the amount appellees otherwise would have received by the amount of money that appellants did not have to pay towards the home equity loan on their Winchester residence. Because the court stated that appellants did not have to pay $200 per month for 17 months for a total of $3,400, $3,400 should be offset from $6,800. Thus, the court determined that appellees were not entitled to $21,189.27. The court instead added interest at 4 percent from the date appellants received the insurance check and then deducted $3,400 from the total.

{¶ 9} On February 6, 2019, the trial court (1) entered a $19,766.41 judgment in appellees' favor; (2) ordered appellants to give appellees a warranty deed; and (3) denied all claims appellants asserted against appellees. This appeal and cross-appeal followed.

I

{¶ 10} Appellants' first assignment of error and appellees' cross-assignment of error raise interrelated issues. For ease of discussion, we consider them together.

{¶ 11} In their first assignment of error, appellants assert that the trial court's judgment is against the manifest weight of the evidence and is inequitable. Appellants contend that appellees should not be entitled to any of the insurance proceeds that they received as a result of the destruction of the Seaman residence because their decision to insure the property for more than the land contract amount should not result in a windfall to appellees. Appellants note that they insured the property for $45,000, which exceeded the value of the land contract by $20,000.

Appellants argue that if they had insured the property only for the amount of the land contract ($25,000), then appellees would have been entitled to a deed to the property and would not have received any money from the insurance proceeds.

{¶ 12} Appellees respond that, as the equitable owners of the property, they are entitled to (1) the insurance proceeds, less the land contract outstanding balance, in order to rebuild the destroyed house, and (2) a deed to the property.

{¶ 13} In their cross-assignment of error, appellants contend that the trial court incorrectly reduced the insurance-proceeds balance by $3,400 as an offset to the amount of appellants' home equity loan payments.

A

{¶ 14} We first observe that, although the trial court explained its reasoning on the record, the trial court did not carry over that reasoning to its judgment entry. It is well-established that "[a] court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum." *Schenley v. Kauth*, 160 Ohio St. 109, 113 N.E.2d 625 (1953), paragraph one of the syllabus; *accord Infinite Sec. Solutions, LLC v. Karam Props. II, Ltd.*, 143 Ohio St.3d 346, 2015-Ohio-1101, 37 N.E.3d 1211, ¶ 29. Moreover, "[n]either the parties nor a reviewing court should have to review the trial court record to determine the court's intentions. Rather, the entry must reflect the trial court's action in clear and succinct terms." *Infinite Sec. Solutions* at ¶ 29.

{¶ 15} In the case sub judice, the trial court's judgment is general and does not set forth specific factual findings or conclusions of law. We recognize, however, that the court is not required to do so in the absence of a proper Civ.R. 52 request. Civ.R. 52 states:

When questions of fact are tried by a court without a jury, judgment may be general for the prevailing party unless one of the parties in writing requests otherwise * * * in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law.

{¶ 16} The purpose of Civ.R. 52 findings of fact and conclusions of law is ""'"to aid the appellate court in reviewing the record and determining the validity of the basis of the trial court's judgment."'"" *Harper v. Neal*, 4th Dist. Hocking No. 2016-Ohio-7179, 2016 WL 5874628, ¶ 18, quoting *In re Adoption of Gibson*, 23 Ohio St.3d 170, 172, 492 N.E.2d 146 (1986), quoting *Werden v. Crawford*, 70 Ohio St.2d 122, 124, 435 N.E.2d 424 (1982). Thus, a party may file a Civ.R. 52 request in order "to ensure the fullest possible review." *Cherry v. Cherry*, 66 [Ohio St.2d] Ohio St.3d 348, 356, 421 N.E.2d 1293 (1981).

{¶ 17} In the absence of findings of fact and conclusions of law, we presume that the trial court applied the law correctly and will affirm its judgment if evidence in the record supports it. *Harper, supra*, at ¶ 19; *Bugg v. Fancher*, 4th Dist. Highland No. 06CA12, 2007-Ohio-2019, 2007 WL 1225734, ¶ 10, citing *Allstate Fin. Corp. v. Westfield Serv. Mgt. Co.*, 62 Ohio App.3d 657, 577 N.E.2d 383 (12th Dist.1989); *accord Leikin Oldsmobile, Inc. v. Spofford Auto Sales*, 11th Dist. Lake No. 2000-L-202, 2002-Ohio-2441, 2002 WL 1012588, ¶ 17 ("It is difficult, if not impossible, to determine the basis of the trial court's ruling without findings of fact and conclusions of law * * *."); *Yocum v. Means*, 2nd Dist. Darke No. 1576, 2002-Ohio-3803, 2002 WL 1729892, ¶ 7 ("The lack of findings obviously circumscribes our review * * *."). As the court explained in *Pettet v. Pettet*, 55 Ohio App.3d 128, 130, 562 N.E.2d 929 (5th Dist.1988):

[W]hen separate facts are not requested by counsel and/or supplied by the court the challenger is not entitled to be elevated to a position superior to that he would have enjoyed had he made his request. Thus, if from an examination of the record as a whole in the trial court there is some evidence from which the court could have reached the ultimate conclusions of fact which are consistent with [the]

judgment the appellate court is bound to affirm on the weight and sufficiency of the evidence.

       The message should be clear: If a party wishes to challenge the * * * judgment as being against the manifest weight of the evidence he had best secure separate findings of fact and conclusions of law. Otherwise his already "uphill" burden of demonstrating error becomes an almost insurmountable "mountain."

{¶ 18} We therefore review appellants' first assignment of error and appellees' cross-assignment with the foregoing principles in mind.

B

In general, appellate courts will uphold a trial court's judgment so long as the manifest weight of the evidence supports it. *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, 62 N.E.3d 153, ¶ 63; *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus ("Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."). When an appellate court reviews whether a trial court's decision is against the manifest weight of the evidence, the court """weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed * * *.""" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20 (clarifying that the same manifest-weight standard applies in civil and criminal cases), quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A reviewing court may find a trial court's decision against the manifest weight of the evidence only in

the "'exceptional case in which the evidence weighs heavily against the [decision].'"
*Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d
172, 175, 485 N.E.2d 717 (1983); *accord State v. Lindsey*, 87 Ohio St.3d 479, 483, 721
N.E.2d 995 (2000). Moreover, when reviewing evidence under the manifest weight of the
evidence standard, an appellate court generally must defer to the fact-finder's credibility
determinations. *Eastley* at ¶ 21. As the *Eastley* court explained:

> "'[I]n determining whether the judgment below is manifestly against the
> weight of the evidence, every reasonable intendment must be made in favor of the
> judgment and the finding of facts. * * *
> If the evidence is susceptible of more than one construction, the reviewing
> court is bound to give it that interpretation which is consistent with the verdict and
> judgment, most favorable to sustaining the verdict and judgment.'"

*Id.*, quoting *Seasons Coal Co.*, 10 Ohio St.3d at 80, fn. 3, quoting 5 Ohio Jurisprudence 3d,
Appellate Review, Section 60, at 191–192 (1978).

{¶ 19} Consequently, "we should not reverse a judgment merely because the record
contains evidence that could reasonably support a different conclusion." *Bugg v. Fancher*, 4th
Dist. Highland No. 06CA12, 2007-Ohio-2019, 2007 WL 1225734, ¶ 9. We additionally note that
"'[a] finding of an error in law is a legitimate ground for reversal.'" *State v. Wilson*, 113 Ohio
St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *Seasons Coal* at 81. Therefore,
appellate courts will generally defer to the fact finder's credibility determinations, but not defer on
matters that involve questions of law.

{¶ 20} In the case at bar, the parties do not appear to seriously dispute the facts. The
parties do not dispute the amount of the insurance proceeds that appellants received, the amount
of the remaining balance due on the land contract, the amount of interest owed on the land contract,
the amount of tax owed, or the amount appellants paid appellees. Instead, the parties basically

argue that the trial court incorrectly applied the law.

C

{¶ 21} This dispute involves the interpretation of the parties' land installment contract and the correct application of the law. Generally, courts review contract-interpretation matters and the application of the law using a de novo standard of review. *E.g., Ross v. Cuyahoga Cty. Bd. of Revision*, 155 Ohio St.3d 373, 2018-Ohio-4746, 121 N.E.3d 365 (stating "because the issue involves an application of the law to largely undisputed facts, we review the issue de novo"); *Boone Coleman Constr., Inc. v. Piketon*, 145 Ohio St.3d 450, 2016-Ohio-628, 50 N.E.3d 502, ¶ 10 (explaining that the interpretation of a contract is a question of law that courts review de novo.).

{¶ 22} The primary goal when a court interprets a contract is to give effect to the parties' intent. *Lubrizol Advanced Materials, Inc. v. Natl. Union Fire Ins. Co. of Pittsburgh, PA.*, — Ohio St.3d —, 2020-Ohio-1579, — N.E.3d —, ¶ 9. Courts presume that the parties' intent resides "in the plain language of the contract." *Id.*, citing *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11. "'When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.'" *Id.*, quoting *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37. Additionally, courts must construe any ambiguous language in a contract against the drafter. *Id.*

{¶ 23} In the case at bar, we first point out that the parties do not dispute that the land contract required appellants to provide insurance on the property. Moreover, the parties do not dispute that the land contract stated that any insurable loss would be "payable to the Vendor and Vendees, as their interests appear." We recognize that this particular language appears to be

standard contract language included in many land contracts. Instead, the parties dispute the precise meaning of the phrase "as their interests appear" and whether appellants, as the vendors who maintained insurance on the property, owe a duty to share the insurance proceeds with appellees, the vendees. Thus, this dispute appears to center upon two questions: (1) whether a vendor who maintains insurance on property subject to a land installment contract has any obligation to the vendee when an insurable loss occurs; and (2) the meaning of the contract language "as their interests appear." Because answering the questions requires an understanding of the nature of the interests under a land installment contract, we first review the general principles that underlie the different interests involved under a land installment contract.

{¶ 24} R.C. 5313.01(A) defines a "land installment contract" as "an executory agreement * * * under which the vendor agrees to convey title in real property * * * to the vendee and the vendee agrees to pay the purchase price in installment payments, while the vendor retains title to the property as security for the vendee's obligation." In other words, "[a] land installment contract is an executory agreement whereby the purchaser (vendee) agrees to pay the purchase price and is vested with equitable ownership, while the seller (vendor) retains bare legal title in the property to secure payment of the purchase price." *Baraby v. Swords*, 166 Ohio App.3d 527, 2006-Ohio-1993, 851 N.E.2d 559, ¶ 14 (3rd Dist.), citing *Wood v. Donohue*, 136 Ohio App.3d 336, 339, 736 N.E.2d 556 (1st Dist. 1999); *Flint v. Holbrook*, 80 Ohio App.3d 21, 608 N.E.2d 809 (2nd Dist. 1992); *Gottfried v. Bacon*, 3rd Dist. No. 16–87–32, 1989 WL 122533 (Oct. 10, 1989).

{¶ 25} Under the doctrine of equitable conversion, when "land is contracted to be sold, * * * equity treats the exchange as actually taking place when the contract becomes effective." *Wood*, 136 Ohio App.3d at 339, citing *Berndt v. Lusher*, 40 Ohio App. 172, 176, 178 N.E. 14 (6th

Dist. 1931).

{¶ 26} The vendee holds an "equitable estate in the land, equal to the amount of the purchase money paid, and which, upon full payment, may ripen into a complete equity, entitling him to a conveyance of the legal title according to the terms of the contract." *Coggshal v. Marine Bank Co.*, 63 Ohio St. 88, 57 N.E. 1086, 44 W.L.B. 208 (1900), paragraph one of the syllabus; *see also Blue Ash Bldg. & Loan Co. v. Hahn*, 20 Ohio App.3d 21, 484 N.E.2d 186, 189 (1984). Moreover, under the doctrine of equitable conversion, the vendee "enjoys all benefits that may accrue." *Kulich v. Troppe*, 9th Dist. No. 15260, *2 (Apr. 8, 1992). However, the vendee also bears the risk of "any loss by a destruction of the property through casualty during the pendency of the contract (neither party being guilty of causing the destruction)." *Sanford v. Breidenbach*, 111 Ohio App. 474, 480, 15 O.O.2d 179, 173 N.E.2d 702, 707 (9th Dist.1960); *accord Gilbert v. Port*, 28 Ohio St. 276, 296, 1876 WL 8, *12 (1876) ("The vendee, as owner in equity, sustains whatever losses happen, and is entitled to all the gains and profits of the estate contracted to be sold.").

{¶ 27} The vendor, on the other hand, "holds not only the legal title, but a beneficial estate, in the lands to the extent of unpaid purchase money." *Coggshal*, paragraph two of the syllabus; *accord Berndt*, 40 Ohio App.3d at 177 (stating that "[t]he interest of the vendor under a contract of purchase is the right to receive the balance of the purchase price"); *see HIN, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 124 Ohio St.3d 481, 2010-Ohio-687, 923 N.E.2d 1144, ¶ 21 (citing *Coggshal* with favor). As this court explained in *Myers v. Parsley*:

> The vendor holds more than naked title; he may mortgage his interest, up to the amount of the balance due, without the consent of the purchaser. R.C. 5313.02(B). The land contract vendor's interest consists of two parts, a right to payment of a sum of money and an interest in the land which declines in value with

each payment.

4th Dist. Gallia No. 85 CA 9, 1986 WL 3279, *1 (Mar. 14, 1986).

{¶ 28} Both the vendor's and the vendee's interests are insurable, and both may be separately insured. *Kulich* at *2. Although "both vendor and vendee may insure the property during this period of time, their interests are different." 3 Couch on Ins., Section 42:62 (3 Ed. December 2019 Update) (footnotes omitted). "A vendor insures against the loss of his or her security interest." *Id.* On the other hand, "the vendee as the equitable owner insures against the loss of the property itself." The treatise's authors explain the consequences when a vendor "agrees to maintain insurance on the property until the title is transferred":

> Although the vendors who retain title have an insurable interest and may collect insurance proceeds for damage to the demised property, where the vendees repair the damage, the vendors are liable to them for the amount of the insurance proceeds, in order to prevent a windfall to the vendors.

*Id.* The Williston on Contracts treatise also discusses the division of insurance proceeds when a vendor agrees to insure the property. The author states that if a land installment contract requires the vendor to insure the property:

> for the benefit of the purchaser, the insurance money will be applied in accordance with the arrangement of the parties, or considered, as between the parties, to represent or take the place of the property, and the rights of the vendor and purchaser to the proceeds will be adjusted according to their legal and equitable rights.

17 Williston on Contracts, Section 50:53 (4th ed. 2019) (footnotes omitted).

{¶ 29} One Ohio court stated in more concrete terms the rule that should apply when a vendor insures property subject to a land installment contract:

> [W]hen A has insurance on property which he contracts to sell to B, but before the title is transferred a loss occurs, A may collect from his insurance company. However, A holds the insurance proceeds in trust for B subject to A's claim for unpaid compensation * * *.

*Kungle v. Equitable Gen. Ins. Co.*, 27 Ohio App.3d 203, 207, 500 N.E.2d 343, 348–49, 27 O.B.R. 242 (9th Dist.1985). In line with *Kungle*, the Ohio Supreme Court stated over a century ago that a vendor holds insurance proceeds for the benefit of the vendee:

> If there was a valid and subsisting contract of sale, whether the purchase-money was all paid or not, so that, in equity, the vendee was owner, then the loss by fire fell on [the vendee], and the receipt of indemnity for that loss by the vendor is for the benefit of the vendee.

*Gilbert v. Port*, 28 Ohio St. 276, 294 (1876).

{¶ 30} We further observe that "'[a]n insurance upon a house, effected by the vendor, is prima facie an insurance upon the whole legal and equitable estate, and not upon the balance of the purchase money.'" *Wilson v. Fireman's Ins. Co. Of Newark*, 403 Mich. 339, 342 (Mich.1978), quoting *State Mut. Fire Ins. Co. v. Updegraff*, 21 Pa. 513, 520 (1853). A land-contract vendor that receives insurance proceeds as a result of an insurable loss must "apply the proceeds according to the terms of the land contract, for the benefit of the [vendee]." *Id.* at 343. In contrast, when a vendee "agrees to insure for the benefit of the seller as his or her interest may appear, the agreement amounts to one to make the proceeds payable to the seller to the extent of the amount of the unpaid purchase price." 3 Couch on Ins., *supra*, Section 42:65.

{¶ 31} In the case sub judice, we believe that our review of the foregoing authorities reveals that the answer to the first question is yes. A vendor who maintains insurance on property subject to a land installment contract has an obligation to the vendee when an insurable loss occurs, and the vendor may be entitled to the insurance proceeds to the extent of the unpaid purchase price,

while the vendee may be entitled to the excess amount. Here, the land contract states that appellants would provide insurance on the property. Although the loss that resulted from the fire fell on appellees, the insurance proceeds that appellants received are for the benefit of the legal and equitable estates.

{¶ 32} We also observe that the trial court and the parties relied upon two Ohio cases that appear to be on point, *Allason v. Gailey*, 2010-Ohio-4952, 189 Ohio App.3d 491 (7th Dist.), and *Kulich v. Troppe*, 9th Dist. Summit No. 15260, 1992 WL 74208 (Apr. 8, 1992). Appellants, however, assert that the two cases significantly differ from the case sub judice. Appellants point out that in *Allason* and *Kulich*, the vendees maintained insurance on the property, while in the case sub judice appellants maintained the insurance.

{¶ 33} We now consider the meaning of the phrase "as their interests appear." *Allason* and *Kulich* are relevant to this second question as both cases reviewed the meaning of that phrase.

{¶ 34} The *Allason* appellate court determined that the meaning of the phrase "as their interests appears" is ambiguous. *Id.* at ¶ 32. In *Allason*, the parties entered into a land installment contract for the purchase of property that contained a double-wide trailer. As part of the agreement, the vendee agreed to provide insurance coverage for the property "in an amount not less than the purchase price balance * * * with loss payable to Vendor and Vendee, as their interest [sic] appear." *Id.* at ¶ 6. The vendee later obtained insurance coverage in the amount of $95,000, with the vendor listed as a lienholder. After a fire destroyed the home, the insurance company declared the home a total loss and issued a $95,000 check jointly payable to the vendee and the vendor.

{¶ 35} The parties could not agree how to divide the insurance proceeds. The vendor

believed that she was entitled to receive the purchase-price balance from the insurance proceeds and that the vendee was entitled to the remainder. The vendor stated that if the vendee wished to replace the home, then the vendee would need to use her own funds to rebuild the home.

{¶ 36} The vendee, on the other hand, believed that she should receive the proceeds in order to purchase a replacement home and that she also should receive any remaining funds. The vendee found a replacement modular home for $27,000 and could place the home on the property for a total cost of $45,000.

{¶ 37} The vendor, however, refused to endorse the insurance check and, instead, demanded that the insurance proceeds be used to pay off the purchase-price balance. The vendor stated that after the pay off, she would transfer the real estate to the vendee. At the time, the purchase-price balance was $90,787.76. Unable to reach an agreement, litigation ensued.

{¶ 38} After a bench trial, the court awarded the vendor $91,069.53, and directed the remaining funds to be distributed to the vendee. The vendee appealed. On appeal, the court first determined that the phrase "as their interest [sic] appear" is ambiguous. The court then considered the parties' intentions and conduct, and construed the phrase against the vendor, the drafter, and in favor of the vendee. The court also looked to *Kulich* to help define the term. The court noted that the *Kulich* court had stated that the phrase meant that the vendors were entitled to "'fire insurance proceeds only to the extent that they carried their burden by proving that their security interest had been impaired.'" *Id.* at ¶ 35, quoting *Kulich* at *1. The court determined that *Kulich* supported the vendee's "position that she was entitled to use the funds to replace the dwelling and retain any excess." *Id.* at ¶ 34. The court explained its understanding of *Kulich* as follows:

> The court in *Kulich* concluded that there was no evidence in the record to
> sustain the trial court's determination that the house was not restored to its prior

condition, since the "Vendors failed to submit a single exhibit which would allow the court to compare the condition of the house before the fire with the state of the house after the repairs. No appraisals or testimony was offered by Vendors, or anyone else, specifying a value difference. * * * At no time during the course of the hearing did the Vendors explain, let alone prove by a preponderance of the evidence, how and to what extent their interests had diminished despite the Purchasers' repairs." *Id.* Thus, the court concluded that absent any evidence of impairment of their security interest, the vendors had no claim to the fire insurance proceeds, and that "[c]onsistent with the standards of equity, the Purchasers are entitled to any amounts remaining after repairs." *Id.* at *3.

*Id.* at ¶¶ 35-36.

{¶ 39} The *Allason* court also noted that, just as the vendors in *Kulich* had not explained to what extent their security interest had been impaired, the vendor in *Allason* likewise "failed to prove how her security interest would be impaired if the destroyed trailer was replaced with a modular home purchased and installed on a foundation with a basement at a cost of $45,000." *Id.* at ¶ 37. The court further observed that the trial court's decision would have permitted the vendor "to receive the full purchase price under the contract without providing what she promised therein, i.e., land and a dwelling." *Id.* at ¶ 46. The *Allason* court also concluded that the vendee "should have been permitted to retain the excess insurance proceeds." *Id.* at ¶ 47. The court noted that the land installment contract did not contain an acceleration clause and that the vendee thus "was not obligated to pay the purchase price balance in full until October 15, 2009." *Id.* at ¶ 48. The court pointed out that the vendee retained the obligation after the fire to continue to make monthly payments and that the vendee could have used the balance of the insurance proceeds, $50,000, to pay the balance due under the contract. Instead, "the trial court's judgment had the effect of terminating the contract prematurely." *Id.* at ¶ 49. The court thus determined that because it could not put the parties in the position they would have been in if the trial court had made the correct decision, the equitable result would be to award the vendee $45,000.

{¶ 40} We, however, do not believe that *Allason* or *Kulich* fully define for us the meaning of the phrase "as their interests appear." Both cases seem to imply that the phrase means that a vendor is entitled to insurance proceeds if the vendor proves that the insurable loss impaired the vendor's insurable interest. *Allason* derived this language regarding impairment of security interest from an earlier case, *Wood v. Donohue*, 136 Ohio App.3d 336, 736 N.E.2d 556 (1st. Dist. 1999).

{¶ 41} Also, unlike *Allason* and *Kulich*, *Wood* did not involve a dispute between a vendor and a vendee over insurance proceeds. Instead, *Wood* involved the proper distribution of settlement funds awarded as a result of a class action suit that sought damages for diminution in value of the property subject to a land installment contract. The lawsuit began before the purchase price had been paid in full. After the purchase price had been paid in full, a $9,478 check for damages was issued to the vendor and the vendee. The parties could not agree to the distribution of funds, and the vendor filed a complaint against the vendee.

{¶ 42} The vendor claimed to be entitled to 65.41 percent of the settlement funds, calculated by considering the portion of the purchase money that the vendee had paid as of December 18, 1984–the date selected to determine the property's diminution in value. The trial court agreed and entered judgment in the vendor's favor. The vendee appealed.

{¶ 43} On appeal, the vendee asserted that he was entitled to the full settlement amount under the doctrine of equitable conversion. The *Wood* court examined the nature of the doctrine and noted that the vendor's interest "'under a contract of purchase is a right to receive the balance of the purchase price, which is secured by his retaining the legal title.'" *Id.* at 339, quoting *Berndt*, 40 Ohio App. at 177. The court further recognized that the vendee is the equitable owner and

"enjoy[s] all the benefits that might accrue." *Id.* at 341. The court also noted that the doctrine of equitable conversion ordinarily applies when determining which party is entitled to insurance proceeds as a result of a loss. The court thus concluded that the same analysis governs the distribution of settlement proceeds and relied on *Kulich* to find that the vendor was "entitled to the proceeds to the extent that she could prove that her security interest in the unpaid purchase money had been impaired." *Id.* at 342. The court determined that, when the settlement check had been issued, the purchase price had been paid in full. For this reason, the court concluded that the vendee should have received the entire amount of the settlement check. To hold otherwise, the court stated, would give the vendor damages for a loss that she did not suffer.

{¶ 44} We observe that the language regarding the impairment of the vendor's security interest seems to have first arisen in *Kulich*. In *Kulich*, the land installment contract required the vendees to maintain fire insurance with both parties named as insureds "as their interests appear." Approximately six months after the parties' agreement, a fire rendered the residence uninhabitable. The insurance company issued a $21,764.47 check payable to the vendor and the vendees. The vendees spent about $8,000 to repair the home.

{¶ 45} The vendors later sued the vendees for forcible entry and detainer, late payments, and failure to repair the home. The trial court determined the vendors are entitled to $3,060 in past due payments, plus $6,000 of the insurance proceeds. The trial court concluded that, because the vendees had not used all of the insurance proceeds to repair the house, the parties should equally divide the excess amount. The vendees then appealed the trial court's decision to award the vendors part of the insurance proceeds. The court of appeals reversed the trial court's decision and noted that the language "as their interests appear" means that the "Vendors were entitled to a

ADAMS, 19CA1088

share of the fire insurance proceeds only to the extent that they carried their burden of proving that their security interest had been impaired." The court did not, however, cite any authority to support its conclusion. We therefore are uncertain of the origin of the rule.

{¶ 46} Our search of Ohio cases for the origin of the rule applied in *Kulich* did not yield any clear answers. However, cases from other jurisdictions shed more light on the allocation of insurance proceeds between a vendor and a vendee when a fire destroys a house subject to a land contract. In *Estes v. Thurman*, 192 S.W.3d 429 (Ky.Ct.App. 2005), the land installment contract required the vendee to obtain insurance on the home. Inexplicably, the vendor provided the insurance. When a fire later destroyed the home, the vendees owed $16,000 on the contract. The insurance company paid the vendor around $34,000 for the loss.

{¶ 47} The vendor later filed a complaint and alleged that the vendees breached the contract by failing to insure the property and requested the court find that the vendees had forfeited their rights under the contract. The vendees filed a counterclaim for the portion of the insurance proceeds in excess of the unpaid balance. The trial court entered judgment in the vendor's favor, except it ordered that a deed be conveyed to the vendees. The vendees appealed the trial court's determination that they were not entitled to the insurance proceeds that exceeded the unpaid balance under the land contract, and the appellate court agreed.

{¶ 48} The court looked to the principles that underlie the doctrine of equitable conversion and determined that the vendor's insurable interest was the amount of the unpaid purchase price– approximately $16,000. The court found that this rule applied even though the insurance policy was in the vendor's name and even though the land installment contract had required the vendees to obtain insurance. The court explained that a vendor who receives fire insurance proceeds for

property subject to a land contract is entitled to the amount of money representing the unpaid purchase price and holds any excess amount in trust for the vendees. *Id.* at 433.

{¶ 49} Tennessee courts have reached a similar conclusion. In *King v. Dunlap*, 945 S.W.2d 736 (Tenn.Ct.App. 1996), the vendors agreed to sell a condemned residence to the vendee for $6,500. The vendors later obtained a fire insurance policy on the property for $30,000. Approximately two years later, a fire destroyed the building. Litigation ensued amongst the vendors, the vendee, the vendor's insurance company, and the bank that held a mortgage on the property. The trial court ordered the proceeds to be distributed to pay the balance on the mortgage and the balance on the land contract. The court further ordered any excess amount be distributed to the vendee. The insurance company appealed and argued that the vendee–a stranger to the insurance policy–was not entitled to any proceeds from that policy. One of the questions presented involved "the extent or amount of a vendor's insurable interest under an agreement for deed or land installment contract." *Id.* at 739. To answer this question, the *King* court looked to one of its earlier unpublished cases, *Parker v. Tennessee Farmers Mut. Ins. Co.*, Roane Circuit CA No. 141, 1988 WL 138923 (Tenn.Ct.App. Dec. 30, 1988). The court quoted *Parker* at length and concluded that an insurance company cannot reduce the vendor's insurable interest in the property to the unpaid purchase price. Instead, "'[t]he measure of the insured's recovery [is] the one created by the policy, that is "the actual cash value of the property at the time of the loss or damage."'" *King* at 743, quoting *Parker* at *3, quoting *Dubin Paper Co. v. Insurance Co. Of North America*, 361 Pa. 68, 92, 63 A.2d 85, 97 (Pa.1949). The court explained that "[w]hat happens to the proceeds after the insurer has fulfilled its obligation to pay is 'between the vendor and the vendee along, or persons in privity with them.'" *Id.*, quoting *Dubin*, 63 A.2d at 97. The

court additionally examined some secondary sources to support its holding:

> At 5A Appleman, Insurance Law and Practice, 212–15 (1970), it is stated:
>
> The equitable rule has obtained in many states that where the building which was the subject of conveyance is destroyed or damaged, the vendor must apply the proceeds upon the purchase price and account for the balance to the purchaser. Other jurisdictions have stated the vendor must either apply the proceeds to the purchase price or to repairs. Nor would carrying out the contract without abatement of the purchase price after the building burned affect the purchaser's rights to the insurance money.
>
> Also, with regard to the rights to insurance proceeds, it is stated at 92 C.J.S., Vendor & Purchaser, § 296:
>
> [T]he insurance money in a case of loss is as between the parties and the insurance company, payable to, and collectable by the vendor ... as between the vendor and the purchaser, the better rule would seem to be that it should belong to whoever must bear the loss resulting from the injury to the property. Hence, if the loss falls on the purchaser ... he is entitled to the benefit of the insurance money, and if it is collected by the vendor, he will hold it for the benefit of the purchaser who will be entitled to credit therefor on the unpaid purchase price or on a mortgage indebtedness assumed by him as part of the purchase price.

*King*, 945 S.W.2d at 743–44. Applying these principles, *King* held that the vendors were entitled to the insurance policy limits, but that they held the "proceeds in excess of their interest, i.e., the unpaid balance of the purchase price, in trust for [the vendee]." *Id.* at 744.

{¶ 50} Based upon our review of the relevant case law, including the principles that underlie the doctrine of equitable conversion, the meaning of the phrase "as their interests appear" appears to refer to the amount of the unpaid purchase price as it relates to a vendor. The vendee's interest, then, is the equitable interest in all of the benefits that pertain to the property, and may include the amount of insurance proceeds in excess of the unpaid purchase price. In another Tennessee case, the court indicated that the majority rule "'holds that where the vendee must bear the loss of an accidental destruction of the property pending completion of the sale, the vendor must credit the insurance proceeds to the contract price absent any contractual agreement to the

contrary.'" *Hillard v. Franklin*, 41 S.W.3d 106, 116 (Tenn.Ct.App. 2000), quoting *Gilles v. Sprout*, 293 Minn. 53, 196 N.W.3d 612 (Minn.1972). At least one Ohio appellate court has touched upon the issue when determining whether a vendor has an insurable interest in property sold under a land installment contract. In *Seifley v. State Farm Fire & Cas. Co.*, 5th Dist. Richland No. 2554, 1988 WL 64753, *3, the court referred to a Massachusetts case that held that:

> the seller of real property under land contract retained an insurable interest for the entire amount of the loss, where he agreed to keep the buildings on the property insured for the benefit of the purchaser. The seller then holds the balance of the proceeds from the insurance recovery, above the balance of the purchase price, in trust for the buyer.

*Id.*, citing *Allyn v. Allyn*, 28 N.E. 779 (Mass.Sup.Ct.1891).

{¶ 51} Applying the foregoing principles to the case at bar, we believe that appellants are entitled to the insurance proceeds to the extent of the unpaid purchase price remaining on the land installment contract and that appellees are entitled to any excess, less any valid offsets. The parties agree that appellants' insurance company paid $44,626.36 under the policy and $19,400 was the unpaid purchase price remaining at the time of the fire. The parties further agreed that appellees owed $745.09 in interest and that appellants had paid $292 in property taxes that appellees were obligated to pay. The total of these three sums is $20,437.09. This amount represents appellants' interest under the land installment contract and is the "interest" contained in the clause "as their interests appear." Thus, under the terms of the land installment contract, appellants are entitled to $20,437.09 of the insurance proceeds. Subtracting this amount from the total insurance payout yields a $24,189.27 insurance-proceeds balance.

{¶ 52} Appellants and appellees also agree that appellants gave appellees $3,000 from the insurance proceeds. This reduces the remaining insurance-proceeds balance to $21,189.27. The

difference between this amount and the amount that the trial court awarded appellees ($19,766.41) equals $1,422.86.

{¶ 53} Although the trial court's judgment does not explain precisely how the court calculated the amount of appellees' damages, we again point out that the court did explain its reasoning on the record. We again note, however, that "[a] court of record speaks only through its journal and not by oral pronouncement or mere written minute or memorandum." *Schenley v. Kauth*, 160 Ohio St. 109, 113 N.E.2d 625 (1953), paragraph one of the syllabus. Nevertheless, we will look to the court's comments to ascertain whether the record as a whole supports its decision to reduce the balance by $1,422.94.

{¶ 54} It appears that the trial court reduced the balance by the alleged $200 monthly home equity payment that appellants did not pay over the course of seventeen months. On the record, the court noted that the land installment contract required $400 per month payments, and before the fire appellees had made fourteen payments. The court then stated that a total of thirty-one payments would have been due through January 1, 2019. Although the court did not explain the reasoning behind this statement, it appears that the court calculated the number of payments due between the start of the contract and the start of the trial, then concluded that seventeen payments remained due would have totaled $6,800. The court then stated that this amount should "be offset by the $200 that [appellants] received for the 17 months that they did not have to pay into the home equity loan." The court thus found that a balance of $3,400 remained due under the land installment contract for those seventeen months. Again, the court stated that the insurance-proceeds balance should be reduced an additional $3,400, bringing the total to $17,789.36.

{¶ 55} We, however, after our review of the record do not believe that competent evidence

supports the trial court's decision to further reduce the insurance-proceeds balance. In particular, we do not find evidence to support a finding that appellants paid $200 per month as a home equity loan payment. Neither appellant testified that the home equity payment was $200 per month. Instead, after appellants' counsel finished his closing argument, the court asked appellants' counsel how much appellants paid per month on the home equity loan. Appellants' counsel responded: "It was not introduced, there was no testimony on it[;] however on the * * * and I don't remember what number it was but the check registry, the two checks prior to the $31,000 was a $200 payment to Fifth Third for the payment." Absent a stipulation, we do not believe that the statements and reference to one or two checks in the amount of $200 constitute competent evidence that the amount of appellants' monthly home equity payment was $200. Because we find no competent evidence to support a finding that the balance of the insurance proceeds should be reduced by $3,400,[1] we agree with appellees that the trial court incorrectly reduced the insurance-proceeds balance by $3,400. We disagree, however, with appellants that the trial court incorrectly determined that appellees are entitled to the balance of the insurance proceeds after deducting the amount of the unpaid purchase price, the outstanding interest, and the property taxes.

{¶ 56} Accordingly, based upon the foregoing reasons, we overrule appellants' first assignment of error and affirm the trial court's decision to award appellees a portion of the insurance proceeds. However, we also sustain appellees' cross-assignment of error. Therefore, we affirm the trial court's judgment in part, and reverse the judgment in part, and we remand this

---

[1]Even if some competent evidence did support the trial court's finding, it appears that the parties may have agreed that the remaining balance owed on the contract was $19,400. Thus, the trial court's decision to further reduce the balance owed may be contrary to the parties' agreement.

matter for the trial court to again consider the issue and evidence concerning appellants' monthly home equity payment and whether the balance owed should be reduced by such payments.

II

{¶ 57} In their second assignment of error, appellants contend that the trial court incorrectly awarded appellees interest on the insurance-proceeds balance that appellees are owed from the date that appellants received the proceeds.

{¶ 58} Inasmuch as we have decided to reverse and remand the trial court's judgment, we conclude that it would be premature to consider whether the trial court incorrectly awarded appellees interest. *See generally State ex rel. Quinn v. Delaware Cty. Bd. of Elections*, 152 Ohio St.3d 568, 2018-Ohio-966, 99 N.E.3d 362, ¶ 37, quoting *State ex rel. Jones v. Husted*, 149 Ohio St.3d 110, 2016-Ohio-5752, 73 N.E.3d 463, ¶ 21 ("To be justiciable, a claim must be ripe for review, and a claim is not ripe 'if it rests on contingent events that may never occur at all.'").

{¶ 59} Moreover, we once again note that, although the trial court stated on the record that it awarded appellees interest, the court did not carry over that statement to its judgment entry. It does appear, however, that the amount of the court's award written in the judgment is consistent with its on-the-record statement that it was awarding appellees interest.

{¶ 60} Accordingly, based upon the foregoing reasons, we overrule appellants' second assignment of error.

III

{¶ 61} In their alternative third assignment of error, appellants assert that, even if appellees are entitled to any insurance proceeds, they should only be entitled to $9,032.91. Appellants contend that the total insurance payout should be reduced by (1) the amount of their outstanding

home equity loan, $31,556; (2) the $3,000 that appellants paid appellees; (3) the $292 in property taxes; and (4) the $745.09 in interest.

{¶ 62} Because our disposition of appellants' first assignment of error disposes of appellants' alternative third assignment of error we do not address it.

{¶ 63} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.   Therefore, we affirm the trial court's judgment in part, reverse the judgment in part, and remand this cause for further proceedings consistent with this opinion.

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART, AND REMANDED
FOR FURTHER PROCEEDINGS
CONSISTENT WITH THIS OPINION.

ADAMS, 19CA1088

JUDGMENT ENTRY

It is ordered that the judgment be affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion   Appellees and appellants shall equally divide the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

ADAMS, 19CA1088

## NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.